UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| ERNO L. NANDORI, *Plaintiff*, *v.* CITY OF BRIDGEPORT, *Defendant*. | Civil No. 3:12cv673 (JBA) January 16, 2014 |
|---|---|

**RULING ON MOTION FOR SUMMARY JUDGMENT**

On May 4, 2012, Plaintiff Erno Nandori brought this employment discrimination action against Defendant City of Bridgeport. (*See* Compl. [Doc. # 1].) Plaintiff alleges that Defendant discriminated against him on the basis of his disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794, by failing to provide him with the reasonable accommodation of additional leave in order to receive treatment for his injuries or to engage in an interactive process regarding that accommodation (Count One) and by refusing to rehire him following his disability retirement when he had recovered from his injuries (Count Two). (*See id.*) Defendant now moves [Doc. # 22] for summary judgment on both of Plaintiff's claims, arguing that Plaintiff was not disabled within the meaning of the Rehabilitation Act, that Plaintiff's requested accommodation was unreasonable, that Plaintiff did not suffer an adverse employment action, and that it had a legitimate non-discriminatory reason for failing to rehire him. For the following reasons, Defendant's motion for summary judgment will be granted.

## I. Background

Plaintiff was employed by Defendant from May 5, 1993 until September 21, 2010 as a member of the Bridgeport Police Department (the "BPD"). (*See* Compl. ¶¶ 12, 30; Ans. [Doc. # 25] ¶¶ 12, 30.) In 2002, Plaintiff was injured in the course of his

employment. (*See* Compl. ¶ 13; Ans. ¶ 13.) While pursuing a wanted felon, Plaintiff fell off a fence and landed on his head and shoulder, suffering several ruptured discs in his neck and herniated discs in his lower back. (*See* Compl. ¶ 14; Ans. ¶ 14.) As a result of this injury, Plaintiff was out of work with pay for nearly three years, returning to duty in late 2005 or early 2006. (*See* Nandori Dep. Tr., Ex. B to Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 22-1] at 18.) In April 2009, Plaintiff suffered from a recurrence of the injury, experiencing sharp pains in his neck and shoulders, followed by numbness on his right side in August 2009. (*See* Compl. ¶ 18; Ans. ¶ 18.) In light of these symptoms, on August 15, 2009, Plaintiff notified his supervisor that he was taking injury leave in order to receive medical treatment for his recurring injury. (*See* Compl. ¶ 19; Ans. ¶ 19.)

The BPD requires employees on long-term injury leave to submit a doctor's note every month verifying that they continue to be unfit for duty. (*See* Nandori Dep. Tr. at 33.) Plaintiff submitted these notes as required, but none of the notes submitted indicated when, if ever, Plaintiff would be fit to return to duty. (*See* Injury Leave Reports, Ex. H to Def.'s 56(a)1 Stmt.) On February 23, 2010, Plaintiff attended an independent medical examination ordered by the BPD.[1] (*See* Report of Dr. Kime, Ex. C to Def.'s 56(a)1 Stmt.) As to the injury to Plaintiff's cervical spine, Dr. Kime reported that Plaintiff needed an additional MRI and might be a candidate for surgical treatment. (*Id.* at 3.) With respect to the injury to Plaintiff's lumbar spine, Dr. Kime reported that Plaintiff was "not a candidate for surgical treatment and [wa]s at a point of maximum medical improvement," and that he could "perform activities as tolerated without any specific

[1] The parties' briefing reflects an immaterial dispute about whether this examination was ordered to evaluate Plaintiff's fitness for duty (*see* Def.'s 56(a)1 Stmt. ¶ 10), or requested in connection with his claim that his treatment should be covered under the Connecticut Workers' Compensation Act (*see* Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 28] ¶ 10).

restriction." (*Id.*) On April 13, 2010, based on this report, the BPD supervisor in charge of sick and injured management ordered Plaintiff back to work. (*See* Apr. 13, 2010 Ltr., Ex. D to Def.'s 56(a)1 Stmt.)

However, because Plaintiff's treating physician, Dr. Carolan continued to certify that Plaintiff was unable to return to work during this same time (*see* Injury Leave Reports), Plaintiff did not return to work. He sought a second opinion from Dr. Perry Shear regarding his fitness for duty, and on April 30, 2010, Dr. Shear issued a report explaining that he had ordered additional scans to evaluate and treat Plaintiff's injury, and stating his opinion that Plaintiff remained "temporarily totally disabled." (Report of Dr. Shear, Ex. E to Def.'s 56(a)1 Stmt. at 2.)[2] In May 2010, the supervisor of sick and injury leave management contacted Plaintiff and informed Plaintiff that he would assist Plaintiff with obtaining a disability retirement, but Plaintiff informed him that he did not want to retire. (See Nandori Dep. Tr. at 44–45.) On May 25, 2010, Defendant notified Plaintiff that it was seeking his retirement as a result of "the findings of [his] recent independent medical exam(s) and refusal to return to full duty as ordered." (*See* May 25, 2010 Ltr., Ex. F to Def.'s 56(a)1 Stmt.)[3] Defendant informed Plaintiff that the Board of Police Commissioners would take up the issue of his retirement at its June 15, 2010

---

[2] Plaintiff claims that his evaluation by Dr. Shear was related to his worker's compensation dispute with Defendant, rather than his retirement from duty—hence Dr. Shear's use of the phrase "temporarily totally disabled," a term of art in the worker's compensation context. (*See* Pl.'s 56(a)2 Stmt. ¶ 14.)

[3] Plaintiff contends that none of the medical reports indicated that he was permanently disabled, and that he had been improperly ordered to return to work while still temporarily disabled, and thus Defendant lacked the authority to order his disability retirement. (*See id.* ¶ 16.) However, Plaintiff's counsel made clear at oral argument that Plaintiff's forced retirement does not form the basis for his disability discrimination claim in Count Two.

meeting. (*See id.*) Under the terms of Plaintiff's pension plan, the Board of Police Commissioners has the power to retire an employee from the BDP if that employee "shall have become permanently disabled for the performance of his duties by reason of mental or physical disability resulting from injury received or exposure endured in the performance of his duty." (*See* Pension Plan, Ex. 1 to Pl.'s Loc. R. 56(a)2 Stmt. § 3.)

On May 17, 2010, Plaintiff's worker's compensation lawyer, Attorney Jon August, wrote to Defendant and requested that the issue of Plaintiff's forced disability retirement be "tabled" until Plaintiff received the results of additional medical tests ordered by Dr. Shear. (*See* May 17, 2010 Ltr., Ex. G to Def.'s 56(a)1 Stmt.) The Board of Police Commissioners then tabled the issue of Plaintiff's retirement for four months. (*See* Board of Police Commissioners Meeting Minutes, Ex. I to Def.'s 56(a)1 Stmt. at 2.)[4] During that time, Plaintiff continued to submit reports from his treating physician to Defendant indicating that he was disabled from work until further notice. (*See* Injury Leave Reports.) These reports did not contain any prognosis for Plaintiff's injury, recommendation for future treatment, or projected date that he might be able to return to duty. (*See id.*)

On June 15, 2010, Plaintiff wrote to the Board of Police Commissioners and the Acting Chief of Police, explaining that his recurring injury had kept him out of work so long because he had only recently received workers' compensation coverage for his required medical treatment. (*See* June 15, 2010 Ltr., Ex. O to Def.'s 56(a)1 Stmt.) He further stated that it was his "strong intention" to return to work, and that he would prefer to receive "need[ed] medical intervention and rehabilitation" and return to work,

---

[4] Plaintiff claims that the meeting minutes do not indicate why the matter was tabled and thus Defendant has no proof that the issue of Plaintiff's retirement was tabled as a result of Attorney August's request. (Pl.'s 56(a)2 Stmt. ¶ 21.)

rather than retire. (*See id.*) Plaintiff requested "understanding and compassion" from Defendant during his recovery, but did not mention a timeframe for his recovery, did not identify a treatment plan that would allow him to return to work, and did not request any specific amount of time to extend his leave. (*See id.*) Plaintiff did not request any other accommodation in the letter besides an unspecified amount of additional injury leave. (*See id.*)

On August 12, 2010, at Defendant's request, Plaintiff underwent an independent orthopedic evaluation to determine his fitness for duty. (*See* Report of Dr. Schweitzer, Ex. J to Def.'s 56(a)1 Stmt.) In his report, Dr. Schweitzer stated that Plaintiff was "unfit now, and for at least the past year, for his regular job, and recommend that Plaintiff "be retired from the police force." (*Id.* at 4.) However, the report did not expressly state that Plaintiff was permanently physically disabled, which is the standard for forced disability retirement in the pension plan. (*See id.*) On September 13, 2010, Defendant wrote to Plaintiff and explained that as a result of his "recent independent medical exam(s)" the Acting Chief was seeking Plaintiff's retirement by the Board of Police Commissioners. (*See* Sept. 13, 2010 Ltr., Ex. K to Def.'s 56(a)1 Stmt.) On September 14, 2010, Attorney August wrote to Defendant, stating that he was "authorized to represent that [Plaintiff] is not contesting the service-related retirement scheduled to be heard by the Board of Police Commissioners . . . . The medical examination performed by Dr. Schweitzer at the request of [the BDP] supports the retirement issues." (*See* Sept. 14, 2010 Ltr., Ex. L to Def.'s 56(a)1 Stmt.)

On September 21, 2010, the Board of Police Commissioners voted to approve the request for Plaintiff's service-related disability retirement, and Plaintiff was retired from employment with Defendant. (*See* Personnel Order, Ex. M to Def.'s 56(a)1 Stmt.) At the

time of his retirement, Plaintiff did not know how much time he might need to recover from his injuries, he did not and could not provide Defendant with an estimate of when he would be able to return to duty, and he did not know if he would ever be sufficiently recovered from his injuries to return to work as a police detective. (*See* Nandori Dep. Tr. at 56, 58.)

After his retirement, Plaintiff began pursuing non-Western medical treatments in an attempt to recover from his recurring injury, including "get[ting] away from Western medicine," yoga, and detoxification. (Nandori Dep. Tr. at 67.) In 2011, Plaintiff began looking for work, and eventually secured a position with the fire-police. (*See id.* at 92–93.) Plaintiff saw Doctor Apiado in order to get medical clearance to perform that job, and he was released back to work. (*See id.* at 93.) In April 2011, Plaintiff and Attorney August began contacting Defendant to determine whether Plaintiff could now return to work as a detective with the BPD. (*See id.* ay 78–79.) At this time, Plaintiff believed he could return to full duty without any accommodation. (*See id.* at 103.) On April 4, 2011, Plaintiff wrote to City Attorney Mark Anastasia, stating that he had been cleared to return to work and requesting "assistance in providing [him] with the information and documentation required to return to work." (Apr. 4, 2011 Ltr., Ex. N to Def.'s 56(a)1 Stmt.)

Attorney Elliot Spector also spoke with City Attorney Anastasi on behalf of Plaintiff (*see* Anastasi Aff., Ex. Q to Def.'s 56(a)1 Stmt. ¶¶ 6–8), and on September 23, 2011, Plaintiff again wrote to City Attorney Anastasi, responding to some of the questions City Attorney Anastasi had posed to Attorney Spector. (*See* Correspondence, Ex. P to Def.'s 56(a)1 Stmt.) In the letter Plaintiff described the history of his injury and his retirement, and indicated that he was fully recovered and had been medically cleared to return to work. (*See id.*) Plaintiff wrote several additional letters to City Attorney

Anastasi on October 13, 2011, October 20, 2011, November 7, 2011, and February 17, 2011, requesting assistance with his return to work and asking to be directed to the appropriate authority with regard to his employment questions. (*See id.*) City Attorney Anastasi never responded to Plaintiff's letters or discussed them with any members of the BPD or the Board of Police Commissioners. (*See* Anastasi Aff. ¶¶ 12–13.) City Attorney Anastasi avers that he did not respond directly to Plaintiff because he understood that Plaintiff was represented by counsel and because he was not authorized to provide Plaintiff with legal advice. (*See id.* ¶¶ 13–14.)

Defendant has no provision or procedure, either in the City Charter, the Pension Plan or the Collective Bargaining Agreement, for reinstating an officer who has been retired on a disability pension except through the usual hiring process for the BPD. (*See id.* ¶ 9–10.) Plaintiff never communicated directly with anyone at the BPD about returning to work and never formally applied for a position. (*See* Nandori Dep. Tr. at 104.) City Attorney Anastasi avers that allowing Plaintiff to return to the position, rank, and seniority status that he occupied at the time of his retirement would displace another active employee of that rank or preclude a lower ranking officer from attaining promotion. (*See* Anastasi Aff. ¶ 11.) Defendant promoted Sean Ronan to replace Plaintiff as a detective with the BPD on September 22, 2011, before the applicable promotion list expired in November 2011. (*See* Report of Personnel Changes, Ex. U to Def.'s 56(a)1 Stmt.)

## II. Discussion[5]

Plaintiff argues that Defendant violated the Rehabilitation Act by failing to grant his request for the reasonable accommodation of additional injury leave to recover from his injury, by failing to engage in an interactive process regarding his requested accommodation, and by failing to reinstate him to his former position as a result of his past disability. Defendant argues that it is entitled to summary judgment on both of Plaintiff's claims because Plaintiff's requested accommodation is unreasonable as a matter of law, because Plaintiff failed to make out a prima facie case of disability discrimination, and because Plaintiff failed to establish that Defendant's legitimate non-discriminatory reason for failing to reinstate Plaintiff was pretextual.[6]

---

[5] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*,453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

[6] Both parties agree that the standards of the Americans with Disabilities Act (the "ADA") apply when determining whether the Rehabilitation Act has been violated, and both cite case law interpreting the ADA when discussing Plaintiff's Rehabilitation claims. The Second Circuit treats claims under the ADA and the Rehabilitation Act identically, unless one of the subtle differences between the two statutes is pertinent to a particular case. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). Because none of

**A. Failure to Accommodate and to Engage in an Interactive Process**

To establish a prima facie case of disability discrimination for failure to accommodate, Plaintiff must show (1) that Defendant is subject to the Rehabilitation Act; (2) that he is an individual with a disability within the meaning of the Rehabilitation Act; (3) that, with or without reasonable accommodation, he could perform the essential functions of his job; and (4) Defendant had notice of his disability and failed to provide such accommodation. *Lyons v. Legal Aid. Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995). If Plaintiff establishes a prima facie case, the burden shifts to Defendant to show that the accommodation would result in undue hardship. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000). For the purposes of Count One only, Defendant does not dispute the first, second, or fourth elements of Plaintiff's prima facie case. However. Defendant argues that Plaintiff cannot establish the third element of his prima facie case—i.e., that he could perform his job with a reasonable accommodation.

"The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment." *McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009). To satisfy this burden, Plaintiff must establish both that his requested accommodation would enable him to perform the essential functions of his job and that it "would allow him to do so at or around the time at which it is sought." *Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 560 (2d Cir. 2009). The parties both focus on Plaintiff's June 15, 2010 letter as the basis for his failure to accommodate claim. In this letter, Plaintiff asked for "understanding and compassion" from Defendant, and informally

---

those "subtle differences" is at play in this case, the Court will reference cases applying both the ADA and the Rehabilitation Act in analyzing Plaintiff's claims.

requested additional time to get needed medical treatment to recover from his injury. (June 15, 2010 Ltr.) Plaintiff does not dispute that there were no accommodations other than additional leave, such as being placed on light duty, that would have allowed him to perform the functions of his position, and that at the time of his letter, he was unable to perform his job without the accommodation of additional leave from his job. (*See* Nandori Dep. Tr. at 64–66.) Thus, Plaintiff must show that his request for additional injury leave was a reasonable accommodation at the time he requested it in order to survive summary judgment on his failure to accommodate claim.

Defendant does not dispute that under some circumstances, "medical leave may be a reasonable accommodation under the [Rehabilitation Act]." *Dark v. Curry County*, 451 F.3d 1078, 1090 (9th Cir. 2006) ("Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer."); *see also Hutchinson v. Ecolab, Inc.*, No. 3:09cv1848 (JBA), 2011 WL 4542957, at *9 (D. Conn. Sept. 28, 2011) ("A medical leave of absence is a recognized form of accommodation and its reasonableness is a question of fact for a jury."). However, Defendant argues that Plaintiff's request for additional injury leave constituted a request for indefinite leave, and therefore was unreasonable as a matter of law. "The duty to make reasonable accommodations does not . . . require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work." *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 338 (2d Cir. 2000); *see also Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 9 (2d Cir. 1999) ("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an

indefinite leave of absence." (quoting *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998)).

Courts in this Circuit have held that where a plaintiff fails to establish that the requested leave would allow him to perform the essential functions of his job, such a request does not constitute a reasonable accommodation. For example, in *Graves*, the plaintiff requested an additional two weeks of unpaid leave to consult with an orthopedic surgeon regarding a heel spur that left him unable to work. 353 F. App'x at 559. The Second Circuit found that even this request for a short and finite amount of leave was not reasonable because the plaintiff "made no showing that [the defendant] at the time of the request had any assurance whatsoever that the accommodation would allow [the plaintiff] to perform the essential functions of his job." *Id.* at 561. There, the plaintiff had previously submitted reports from his doctor to his employer stating that he would not be able to return to work "in the foreseeable future" and indicating that even with the surgical consultation the plaintiff might require an additional two to three months to recover. *Id.*

Similarly, in *Forgione v. City of New York*, No. 11-CV-5248, 2012 WL 404983, at *8–9 (E.D.N.Y. Sept. 13, 2012), the district court determined that the plaintiff's request for "some time off so he could address his medical condition" did not constitute a reasonable accommodation because the plaintiff failed to inform the defendants of "how much leave he would need, what he would do during his leave, [or] whether and how the leave would allow him to perform the essential functions of his job." *See also Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 733 (S.D.N.Y. 2012) ("The U.S. Court of Appeals for the Second Circuit has explained that where there is no indication of when an employee will return, an employer has no obligation to grant an employee an indefinite leave of

absence." (internal citations and quotation marks omitted)); *Santiago-Marra v. CSC Holdings, Inc.*, No. 3:09-CV-798 (RNC), 2011 WL 3930290, at *4 (D. Conn. May 11, 2011) (finding that a request for additional leave was unreasonable where "defendant had no assurance that additional leave would enable plaintiff to perform the essential functions of her job"); *McNamara v. Tourneau, Inc.*, 496 F. Supp. 2d 366, 377 (S.D.N.Y. 2007) ("An employer cannot reasonably be expected to hold a job open for an employee without some indication that the employee is likely to return and some idea of when that is likely to happen."); *Stamey v. NYP Holdings, Inc.*, 358 F. Supp. 2d 317, 327 (S.D.N.Y. 2005) (holding that a request for additional leave was unreasonable where the plaintiff "presented no evidence concerning when he would or could return to work" and the evidence was undisputed that "plaintiff was unable to work [and] that his doctors were unable to tell him when he could return to work"); *Cousins v. Howell Corp.*, 113 F. Supp. 2d 262, 271 (D. Conn. 2000) (holding that a request for additional leave was unreasonable where there was no evidence that the defendant "had any indication of when plaintiff would be returning to work").

Plaintiff attempts to distinguish *Forgione*, arguing that unlike the request at issue in that case, Plaintiff's June 15, 2010 letter included a clear indication that the requested leave would be temporary, and that upon completing his treatment, Plaintiff would be able to return to work. Plaintiff further argues that the circumstances of this case are more akin to those at issue in *Hutchinson*, where the plaintiff was on medical leave from July 2008 to December 2008 as a result of an unknown condition that caused dizzy spells, memory loss, and chest pains. *See* 2011 WL 4542957, at *2–3. In December 2008, the plaintiff was placed on a heart monitor for thirty days, and informed his employer that he expected his doctor to clear him for work at the end of that thirty-day period if nothing

happened during that time. *Id.* at *4. However, the defendant indicated that it did not interpret this information as supplying an exact return date or indicating that the plaintiff would soon be able to return to work. *Id.* The Court held that this conflicting interpretation of the ordered heart monitoring raised a dispute of fact as to whether the requested accommodation lacked sufficient specificity to render it reasonable. *Id.* at *9; *see also Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 204–05 (D. Conn. 2013) ("[S]ome courts in this [C]ircuit have reasoned that a plaintiff's inability to precisely state the specific date of return does not make his request for leave unreasonable.").

Unlike the circumstances of *Hutchinson*, there is no dispute of fact as to the specificity of Plaintiff's requested accommodation. As Plaintiff admitted in his deposition, at the time of his retirement, Plaintiff had no sense of when he would be sufficiently recovered to perform the essential functions of his job. (*See* Nandori Dep. Tr. at 66.) Unlike the plaintiff in *Hutchinson*, Plaintiff never communicated to Defendant, either in his June 15, 2010 letter or otherwise, what his estimated return date might be, nor, as he admits, could he have. Furthermore, there is no evidence in the record that Defendant had any information regarding a planned course of treatment that would allow Plaintiff to perform his former duties. None of the progress reports Plaintiff submitted in connection with his injury leave contained a prognosis stating when, if ever, Plaintiff would be able to return to work. (*See* Injury Leave Reports.) Further, an independent medical examination ordered by Defendant noted that no new medical procedures were scheduled, declared that Plaintiff was unfit for duty and had been for at least the past year, and opined that Plaintiff should be retired from the police force. (*See* Report of Dr. Schweitzer at 3–4.) Plaintiff's characterization of the June 15, 2010 letter notwithstanding, Plaintiff requested sufficient leave to receive treatment and recover, but

provided no description of that treatment, nor an estimate of how long might be needed. (*See* June 15, 2010 Ltr.) Although Plaintiff eventually pursued a non-Western course of treatment that allowed him to recover, he did not begin this treatment until after his retirement and there is no evidence that he ever notified Defendant that he would be pursuing this treatment. Therefore, based on the record before the Court, there is no evidence that "[Defendant] at the time of the request had any assurance whatsoever that the accommodation would allow [Plaintiff] to perform the essential functions of his job." *Graves*, 353 F. App'x at 561. Thus, no reasonable jury could find that Plaintiff's request for indefinite leave was reasonable, and Plaintiff has failed to establish a prima facie case of failure to accommodate.

Although Plaintiff has not brought an independent cause of action for failure to engage in an interactive process in the Complaint, he does argue that Defendant's failure to engage in an interactive process regarding his request for additional injury leave is sufficient to support his failure to accommodate claim, because Defendant was obligated to investigate his request to determine whether or not there was some finite amount of leave that would have permitted Plaintiff to return to work. Defendant disputes that it failed to engage in an interactive process with Plaintiff, arguing that it gave him an additional four months of injury leave and ordered an independent medical evaluation in order to provide Plaintiff with additional time to treat his injuries and establish a timeframe in which he would be able to return to work. (*See* May 17, 2010 Ltr.; Board of Police Commissioners Meeting Minutes; Report of Dr. Schweitzer.)

However, even if Defendant's actions did not constitute engagement in an interactive process, the Second Circuit has held that "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and

evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." *McBride*, 583 F.3d at 101. As discussed above, Plaintiff's only identified accommodation was a request for indefinite injury leave, which, as a matter of law, does not constitute a reasonable accommodation, and thus Defendant's alleged failure to engage in an interactive process does not give rise to liability in this case. *See Graves*, 353 F. App'x at 561 (holding that where the plaintiff's request for additional medical leave was unreasonable because it gave the employer no assurance that the plaintiff would be able to perform the essential functions of his job, the defendant's alleged rejection of the plaintiff's request without engaging in an interactive process did not give rise to an independent claim for a violation of the ADA). Therefore, Defendant's motion for summary judgment is granted with respect to Count One.

**B. Failure to Rehire**

Plaintiff's employment discrimination claim for failure to rehire is subject to the *McDonnell Douglas* burden-shifting analysis. *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Thus, Plaintiff must first establish a prima facie case of discrimination, then the burden shifts to Defendant to offer a legitimate non-discriminatory reason for the complained of action, and finally Plaintiff has the burden to establish that Defendant's proffered reason is a pretext. *Id.* To establish his prima facie case, Plaintiff must prove that: (1) he is an individual with a disability within the meaning of the Rehabilitation Act; (2) he could perform the essential functions of his job with or without a reasonable accommodation; (3) he suffered an adverse employment action because of his disability, and (4) Defendant receives federal funds. *See D'Amico v. City of New York*, 132 F.3d 145, 150 (2d Cir. 1998). Defendant argues that Plaintiff cannot make

out his prima facie case of discrimination because he did not suffer an adverse employment action.[7] Defendant further argues that it had a legitimate non-discriminatory reason for failing to rehire Plaintiff. Plaintiff counters that he has established a prima facie case, and that Defendant's proffered reason for failing to rehire him is pretextual.[8]

Defendant argues that Plaintiff cannot establish the third prong of his prima facie case because he did not suffer an adverse employment action. "In failure to rehire cases, the plaintiff usually must show: (i) that he belongs to a [protected group]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Nader v. ABC Television, Inc.*, 150 F. App'x 54, 56 (2d Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 242, 253 n.6 (1981)). Defendant argues that Plaintiff never applied for a position because Plaintiff's letters to City Attorney Anastasi did not constitute employment applications, and that therefore Plaintiff cannot show Defendant failed to rehire him.[9] The Court agrees.

---

[7] Defendant argued in its briefing that Plaintiff cannot establish that he is "disabled" within the meaning of the Rehabilitation Act. However, at oral argument, counsel for Defendant conceded that in light of the ADA Amendments Act of 2008, so long as Plaintiff establishes that he was subjected to an adverse employment action because of his past injuries, he will have met the "regarded as" definition of disability and will have established the first prong of his prima facie case.

[8] Because the Court concludes that Plaintiff failed to establish a prima facie case of discrimination, it will not address the parties' arguments regarding pretext.

[9] Defendant does not dispute that as of the date of Plaintiff's first letter to City Attorney Anastasi, Plaintiff's old position was still open. (*See* Correspondence; Notice of

Plaintiff does not dispute that the City Attorney's Office was the only department he contacted regarding his potential return, that he never spoke with anyone at the BPD about applying to be reinstated, and that he did not take an employment test or fill out a formal employment application, as he had done when he was first hired by the BPD. Thus, unless Plaintiff can show that his letters to City Attorney Anastasi constitute an "application" for an open position with the BPD, his failure to rehire claim cannot withstand summary judgment. Although Defendant does not point to any case in which the Second Circuit addressed the question of whether such letters could constitute an application for employment, it has identified several cases from outside this Circuit holding that under similar circumstances a plaintiff had not "applied" for a position such that he or she could maintain a failure to rehire claim. For example, in *Gilbert v. City of St. Charles*, No. 96 CV 7101, 1999 WL 182151 (N.D. Ill. Mar. 24, 1999), the district court rejected the plaintiff's failure to rehire claim because he failed to establish that he had applied for his former position. There, the plaintiff had resigned from his job as a police officer as a result of a medical condition. *Id.* at *3. About seven months later, he contacted the city to discuss reemployment and was told that he would need to apply and compete in the normal hiring process. *Id.* at *4. However, the plaintiff did not reapply when the city advertised for police officers. *Id.* The district court found that the plaintiff had failed to show that he had complied with the city's job application procedures, and that his informal request to have his job back was not sufficient to support an ADA claim because the ADA does not require employers to abandon their normal employment procedures. *Id.* at *11.

---

Personnel Change.) However, before Plaintiff sent any additional letters, the position was filled. (*See* Correspondence; Notice of Personnel Change.)

Similarly, in *Brown v. Bd. of Regents*, 353 F. App'x 169 (10th Cir. 2009) the plaintiff was laid off when her employer failed to receive grant funding to finance her position. *Id.* at 171. When the university unexpectedly received additional funding, the plaintiff called her former supervisor who was no longer employed with the university. *Id.* at 173. The supervisor did not return her calls and the plaintiff never contacted the new individual in charge of her department or formally applied for her former position. *Id.* The court held that based on these facts, the plaintiff could not sustain her failure to hire claim. *Id.*; *see also Velez v. Janseen Ortho, LLC*, 467 F.3d 802, 808–09 (1st Cir. 2006) (plaintiff's letter to her former employer indicating that she would like to be considered for any available position was not an application for a discrete available position as required for a Title VII claim); *Easterling v. Connecticut*, 356 F. Supp. 2d 103, (D. Conn. 2005) (holding that plaintiff's submission of her resume and an inquiry regarding open positions failed to establish that she had applied for a position and her Title VII claim failed); *Kelly v. Drexel Univ.*, 807 F. Supp. 864 (E.D. Pa. 1995) (holding that plaintiff's letter to the university requesting information about appropriate openings was insufficient to show that plaintiff actually applied for a particular position such that she could sustain a failure to rehire claim). *But see Hotchkiss v. CSK Auto Inc.*, 918 F. Supp. 2d 1108, 1126–27 (E.D. Wash. 2013) (holding that plaintiff did not need to formally apply for a position to pursue a failure to rehire claim and that plaintiff's calls to two of his former supervisors and several members of the human resources department regarding a specific open position were sufficient to show that he had applied for a position).

The circumstances of this case are nearly identical to those in *Gilbert*. Although the City Attorney's Office never responded to Plaintiff's inquiries or directed him to pursue the formal application process, it is undisputed that Plaintiff did no more than

informally request to be reinstated to his former position. In fact, his April 4, 2011 letter requested only that City Attorney Anastasi "assist[] in providing [him] with the information and documentation required to return to work." (Correspondence.) He never contacted anyone responsible for hiring at the City and never communicated his interest in returning to the BPD. As in *Gilbert*, Plaintiff's inquiries and requests for information to a department that is not typically responsible for hiring employees does not constitute an "application" such that Plaintiff can establish that Defendant failed to rehire him.

At oral argument, counsel for Plaintiff argued that even if City Attorney Anastasi had responded to Plaintiff's letters and informed him that he would need to formally apply and compete in the normal hiring process, this still would have constituted a violation of the Rehabilitation Act. Thus, Plaintiff appears to assert that it was Defendant's failure to reinstate him to his former position, with his former benefits and seniority that represents the true adverse employment action complained of in this lawsuit. However, as Defendant's counsel clarified at oral argument, the City's policy is that no former employee who has retired, regardless of whether that retirement was a disability retirement, can be reinstated, and that all retirees who wish to return to employment with the City must formally reapply and compete in the normal hiring process without the benefit of their former seniority status. As the court noted in *Gilbert*, an employer need not deviate from its normal hiring practices and job application procedures "when a former employee with a known disability attempts to rejoin its ranks." 1999 WL 182151, at *11. Plaintiff has not identified any case establishing that the Rehabilitation Act provides an unlimited right to reinstatement to formerly disabled retirees where an employer's hiring policies provide no such right to a retiree without a

history of disability attempting to resume employment. Thus, Plaintiff has failed to establish that he was subjected to an adverse employment action and cannot establish a prima facie case of disability discrimination for failure to rehire. Defendant's motion for summary judgment is therefore granted with respect to Count Two.

**III. Conclusion**

For the foregoing reasons, Defendant's Motion [Doc. # 22] for Summary Judgment is GRANTED. The Clerk is directed to enter judgment for Defendant and to close this case.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of January, 2014.